IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,

v.

ALFONSO RANDALL,

                Defendant.

REPORT AND
RECOMMENDATION

21-cr-28-wmc

---

## REPORT

The grand jury has charged defendant Alfonso Randall with two counts of being a felon in possession of a firearm.

Randall, by counsel, has moved to suppress all evidence obtained directly and derivatively from the review of his two private Facebook accounts by undercover police officers. The government responds that both officers, while employing their undercover personae, requested and received Randall's consent to access these accounts. Randall replies that his consent is not valid because the agents deceived him. For the reasons stated below, I am recommending that the court deny Randall's motion. First, Randall has not challenged the evidence establishing probable cause to search his residence for evidence of marijuana trafficking, which would have led to the discovery and seizure of his firearms under the plain view doctrine. Second, the law is clear that police may employ the thoroughly deceitful technique of using undercover officers to conduct criminal investigations. Nothing that happened here violated Randall's Fourth Amendment rights. That said, there is a possible First Amendment retaliation lurking in the background, but this does not appear to affect this court's decision on Randall's suppression motion.

After some back-and-forth between the parties and the court, *see* dkts. 25, 50 and 53, the parties agreed that the relevant facts have been put into the record and are not disputed. They are as follow:

**Facts**

Alfonso Randall is a self-described community activist who lives in Janesville, Wisconsin. As a community activist, Randall is concerned about the history of racism in Janesville and in the Janesville Police Department (JPD). In February 2021, Randall administered and maintained two Facebook pages. One was his personal page, the other was for the "New Black Panther Party Janesville WI." Randall had set the privacy settings for both pages so that he could limit access to individuals known to him and who he believed supported his positions on social and political issues. In other words, no one could access either Facebook page for any purpose without Randall's permission. Randall had never given permission for any law enforcement officer to access either Facebook page or to download videos from either page.

Unbeknownst to Randall, officers from the Janesville Police Department (JPD) had infiltrated both of his Facebook accounts through undercover or "ghost" Facebook accounts. The government has identified both ghost accounts in a sealed submission (dkt. 51, *sealed*) and Randall has submitted cover pages from the two ghost accounts (dkt. 52-1, *sealed*). The record before the court does not show when or why JPD began its undercover investigation of Randall. Randall does not deny that he permitted access to his personal Facebook account by the person who claimed on her own cover page to be an exotic dancer in Janesville, and Randall does not deny that he permitted access to the Black Panther Facebook account by the person who reported on his own cover page that he had been a member of the New Black Panther Party Janesville since August 22, 2020.

One of Randall's specific concerns as an activist is the risk that traffic stops involving motorists of color might turn into racially-charged events. Because of this, Randall sometimes records such stops, presumably on his cell phone. At about 9:00 p.m. on February 20, 2021, Randall left his house to record a nearby traffic stop by JPD involving a Black motorist. Randall was concerned that this traffic stop, which had started as a license plate violation, had escalated to a full automobile search that exposed the motorist to danger from the police. While Randall recorded the unfolding events, he verbally sparred with the officers, who directed him not to stand in the street while recording their actions; Randall rejoined by accusing them of being prepared to draw a firearm on him. Randall retreated to the curb to continue recording; a JPD sergeant stood nearby. Later, that sergeant would report that he could smell the odor of marijuana emanating from Randall's person.

Randall walked home without incident, apparently continuing to live stream a narrative of what had just transpired. Three JPD officers arrived soon thereafter to charge Randall with disorderly conduct and obstructing an officer. Due to JPD Covid protocols, the officers did not arrest Randall but presented him with a summons. While interacting with Randall, the officers smelled the aroma of marijuana wafting from inside Randall's residence.

Within 30 minutes of the summons being issued, Randall had posted his video of the traffic stop on the Black Panther Facebook page. The JPD undercover officer who had access to this account was at work that night and he viewed the 17-minute video. The video closed with Randall standing inside his residence displaying a black handgun while exhorting his followers to fight back against the police. The undercover officer forwarded this video within JPD, and it was viewed by JPD Officer Lyle Hollingshead, the applicant and affiant for the search warrant that Randall now is challenging.

3

The next day, February 21, 2021, Officer Hollingshead received and viewed a video obtained from Randall's personal Facebook page by the undercover officer to whom Randall had granted access. The record before this court does not indicate when the undercover officer first viewed and saved this video. The video was date-stamped 2-9-21 and it showed Randall and his stepson at a gun range holding two handguns, both of which Randall discharged. One of the firearms appeared to be the same weapon that Randall had brandished during his February 20, 2020 live-stream video of the traffic stop.

On February 23, 2021, Officer Hollingshead put all of this information into a search warrant affidavit, along with his report that Randall was a convicted felon. Officer Hollingshead also reported that the officer who interacted with Randall during the February 20 traffic stop had reported that Randall smelled of marijuana, and that all three of the officers who visited Randall at his home to issue a summons reported that they could smell the distinct odor or marijuana coming from the interior of Randall's residence. The application sought to search for evidence related to the crimes of possession of THC and felon in possession of a firearm. A Rock County Circuit Court Commissioner issued the warrant that same day.

Apparently the warrant was executed on February 23, 2021 and one of the firearms was found and seized. (This court does not have a copy of the warrant return, so it is unknown whether any drug-related evidence was seized). At the time officers executed the warrant, Randall happened to be at a meeting with JPD Lieutenant Blaser at the police department on some other topic. Randall was arrested and interrogated; during questioning, he made self-incriminating statements.

## Analysis

When Randall filed his motion to suppress, he did not know that the undercover officers had sought and obtained his permission to visit his two Facebook pages. This led him to suspect that the police had illegally hacked into those pages. In response to Randall's motion, the government disclosed that undercover JPD officers had created false identities which they presented to Randall online when requesting–and obtaining–Randall's permission to visit his personal Facebook page and the Black Panther Facebook page. Randall now claims that this trickery violated his Fourth Amendment rights. More on this in a bit.

But let's start with a point that neither Randall nor the government has addressed: the police had probable cause to support their warrant request based solely on the aroma of marijuana emanating from Randall personally and from his residence on February 20, 2021. In his warrant application, Officer Hollingshead reported that JPD Sergeant Severson stood next to Randall during the third-party traffic stop and reported that Randall "smelled of marijuana." Sgt. Severson, Sgt. Wehmas and Officer Cronin visited Randall at his home that same evening, and "all could smell the distinct odor of marijuana coming from the interior of the residence."

In the Seventh Circuit, it is still the law that the smell of burnt marijuana, by itself, provides probable cause to search. *United States v. Kizart*, 967 F.3d 693, 695-96 (7th Cir. 2020); *United States v. Mosby*, 541 F.3d 764, 768 (7th Cir. 2008). Maybe this is going to change in light of the legalization of certain hemp and CBD products in Wisconsin, but it hasn't changed yet. *Cf. In the Interest of B.W.R. v. B.W.R.*, 2021 WI App. 36, 2021 WL 1652571 (April 28, 2021)(under Wisconsin law, the unmistakable odor of marijuana coming from a suspect's apartment provides probable cause to search, *quoting State v. Hughes*, 2000 WI 24, ¶22 (2000)).

The search warrant issued by the state court specifically found probable cause that Randall's residence contained marijuana and other evidence related to drug trafficking. *See* dkt. 41-2.

Therefore, even if this court were to redact from the warrant application all references to the Facebook videos showing Randall in possession of firearms, it would not quash the warrant because there still would be probable cause to search Randall's home for marijuana-related evidence. *See United States v. Thompson*, 811 F.3d 944, 948 (7th Cir. 2016) ("a search warrant based partly on tainted evidence will still support a search if the untainted information, considered by itself, establishes probable cause for the warrant to issue," citations omitted). Because the police already knew that Randall was a convicted felon, any firearms encountered during this search for drug-related evidence could have been/would have been seized under the plain view doctrine, *see United States v. McGill,* 8 F.4th 617, 621-22 (7th Cir. 2021). So, it's game over for Randall.

For completeness's sake, let's address Randall's complaint about law enforcement trickery. In his initial brief following disclosure of the JPD "ghost accounts," Randall argued simply that:

> The government has the burden of proving that Mr. Randall's consent was voluntarily given under these circumstances. *See Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). If the consent was induced by trickery, the search is unreasonable under the Fourth Amendment and/or violative of the due process [*clause*] under the Fifth amendment. *See United States v. Serlin,* 707 F.2d 953, 956 (7th Cir. 1983).

Def.'s 4/13/22 Reply to Gov. Submission, dkt. 52, at 2.

At an April 14, 2022 telephonic status conference, the court cited another case both sides should read: *United States v. Thompson*, 811 F.3d 944 (7th Cir. 2016), which originated in this

6

court. The government cites extensively to *Thompson* in its April 29, 2022 opposition brief (dkt. 54); in reply, Randall endeavors to distinguish *Thompson*, and raises more general concerns about his reasonable expectation of privacy.

Let's start by determining how tightly *Serlin* and *Thompson* fit the facts of Randall's case. *Serlin* is a tax case, in which IRS-CID agents met with the defendant to obtain information for their criminal investigation of one of his business associates. The agents told defendant that he was not a subject of any investigation, but as the conversation continued, they advised him of his right not to incriminate himself, then read him the IRS's noncustodial advisement of rights, then asked him questions about his own failure to file a tax return for 1976. (There were more meetings and discussions but they are not relevant to Randall's situation) After he was indicted, defendant moved to suppress his statements to the agents, claiming that they were the result of trickery and deceit: he gave his statements because the agents induced him to believe he was not a subject of the investigation. In analyzing this claim, the court employed this test:

> [D]efendant must produce clear and convincing evidence that the agents affirmatively misled him as to the true nature of their investigation. Defendant must also prove that the misinformation was material in his decision to speak with the agents. Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead.

*Serlin*, 707 F.2d at 956.

The court determined that the defendant had not met his burden and denied his motion. *Id*. at 957. Randall points to the language quoted above to argue that he has passed the deceit threshold articulated by the court.

But the test employed in *Serlin* is inapposite to an undercover investigation like that undertaken by JPD in this case. Undercover police work, by definition, is premised on successfully deceiving the target and "it is firmly established that the government may use informants and that an informant's failure to disclose his true identity does not render consent to his presence invalid." *Thompson*, 811 F.3d at 948. "Nor does a person have a privacy interest in what he voluntarily discloses to an informant." *Id.* at 949.

Randall argues that *Thompson* is not on point because it involved inviting a flesh-and-blood informant into a physical location, which, he posits, is not analogous to admitting a Facebook user to one's Facebook page. Dkt. 55 at 2. This distinction is not recognized by the law. *See, e.g., United States v. Leal*, 1 F.4th 545, 547 (7th Cir. 2021) (defendant tricked into arranging a sexual liaison with an undercover FBI agent posing as a teenage boy); *United States v. Taylor* 777 F.3d 434, 436 (7th Cir. 2016) (defendant convicted of engaging in sexual acts in front of a webcam during online chats with a law enforcement officer posing as a 13-year-old girl.)

The other cases that Randall cites in his reply brief do not change the outcome. *United States v. Chavez*, 423 F. Supp.3d 194, 198-201 (W.D. N.C. 2019), holds that a person has a legitimate expectation of privacy in the non-public content of his social media account; thus, a valid warrant is required to search such content. That's true, but "consent is a well-recognized exception to the Fourth Amendment's warrant requirement." *United States v. Jones*, 22 F.3d 667, 675 (7th Cir. 2022). Therefore, the court's observation in *Chavez* does not advance the analysis in Randall's case. Neither do Randall's citations to *United States v. Irving*, 347 F. Supp.3d. 615, 623 (D. Kan. 2018), and Facebook/Meta's policies and rules, or the cases cited in footnote 2 of his reply brief, dkt. 55 at 5.

Slightly more relevant to the court is Randall's assertion that the police had infiltrated his Facebook pages *before* February 20, 2021 and therefore "did not even have suspicion of criminal activity warranting investigation" until the incidents of that evening. *See* dkt. 55 at 8-9. The first half of Randall's assertion almost certainly is true. The record is silent on the second half: neither the court nor Randall knows why JPD sought and obtained access to Randall's Facebook accounts. Did the police have a *bona fide* reason to do so based on credible information that Randall was engaging in criminal activity? Or did "the officers target [ ] Mr. Randall just because he was a pain in the neck from their point of view, due to his vociferous fight against what Mr. Randall perceived as racist police practices in Janesville"? Reply Br., dkt. 55 at 8-9.

However troubling the answers to these questions might be, they do not affect the outcome of Randall's suppression motion. As noted above, the warrant is valid even if the court deletes and ignores all references to the videos that JPD retrieved from Randall's Facebook pages.

That said, if the government wishes to pick up Randall's gauntlet, then during the objection period it could submit under seal evidence establishing a legitimate basis for JPD's undercover investigation of Randall prior to February 20, 2021. If the government does so, and if Judge Conley then finds that the investigation was proper, then the court's consideration of the videos when deciding Randall's motion to suppress would be unimpeachable.

On the other hand, even if Randall is correct that JDP had targeted his Facebook accounts for political reasons, this wouldn't seem to advance his suppression motion. Randall might have grounds for a civil lawsuit under 42 U.S.C. §1983: a criminal investigation undertaken in retaliation for a person's political views and advocacy could amount to a violation of that person's First Amendment rights. *See Archer v. Chisholm*, 870 F.3d 603, 618-19 (7th Cir.

9

2017). This, however is distinct from any claim under the Fourth Amendment, *see id.* at 618-19; *see also United States v. Soybel*, 13 F.4th 584, 594 (7th Cir. 2021)("the sole purpose of the exclusionary rule, after all, is to deter future Fourth Amendment violations," citation omitted). Playing out the hand on government misconduct motions, Randall fares no better under the selective enforcement doctrine, which applies to dismissal motions, not suppression motions. The doctrine forbids selective enforcement of the law based on considerations such as race. *See Conley v. United States*, 5 F.4th 781, 788 (7th Cir. 2021)("racially selective law enforcement is a quintessential equal protection violation.") Once again, the aroma of marijuana that the officers detected emanating from Randall's home constitutes neutrally obtained probable cause for the search that led to the instant indictment.

## RECOMMENDATION

Pursuant to 42 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny defendant Alfonso Randall's motion to suppress evidence.

Entered this 23rd day of May, 2022.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Madison, Wisconsin 53703

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

May 23, 2022

Corey Charles Stephan
U.S. Attorney's Office
222 W. Washington Ave.
Suite 700
Madison, WI 53703

David R. Karpe
Karpe Law Office
448 W. Washington Av.
Madison, WI 53703

      Re:    United States v. Alfonso Randall
              Case No. 21-cr-28-wmc

Dear Counsel:

      The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

      The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

      In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before June 6, 2022 by filing a memorandum with the court with a copy to opposing counsel.

      If no memorandum is received by June 6, 2022, the court will proceed to consider the magistrate judge's Report and Recommendation.

                                Sincerely,
                                /s/
                                Susan Vogel for Connie A. Korth
                                Secretary to Magistrate Judge Crocker

Enclosures

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

      (1) injunctive relief;
      (2) judgment on the pleadings;
      (3) summary judgment;
      (4) to dismiss or quash an indictment or information;
      (5) to suppress evidence in a criminal case;
      (6) to dismiss or to permit maintenance of a class action;
      (7) to dismiss for failure to state a claim upon which relief can be granted;
      (8) to dismiss actions involuntarily; and
      (9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report

and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).